IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KENNETH E. FROST,

    Petitioner,

v.                            Case No. 11-3170-SAC

DAVID MCKUNE, et al.,

    Respondents.

**MEMORANDUM AND ORDER**

This case comes before the Court on Petitioner's motion for a writ of habeas corpus pursuant to 28 USC § 2254.

**I. Procedural Background**

Petitioner was convicted by a jury in the District Court of Johnson County, Kansas, of one count of aggravated indecent liberties. Thereafter, Petitioner filed multiple motions requesting a new trial based on ineffective assistance of trial counsel. After conducting hearings, the court denied the motions then sentenced Petitioner to 204 months of imprisonment. The Kansas Court of Appeals (KCOA) subsequently affirmed Petitioner's conviction and the denial of his motion for a new trial. *State v. Frost*, 212 P. 3d 263, 2009 WL 2371007 (Kan. Ct. App. July 31, 2009) (Case No. 98,433) (Unpublished Opinion). Petitioner unsuccessfully filed a petition for review to the Kansas Supreme Court.

## II. AEDPA Standard

This matter is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. ––––, 130 S.Ct. 1855, 1862 (2010) (citation and internal quotation marks omitted). Under AEDPA, where a state prisoner presents a claim in habeas corpus and the merits were addressed in the state courts, a federal court may grant relief only if it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *Wilson v. Trammell*, __ F.3d __, 2013 WL 494160 (Feb. 11, 2013 10th Cir.).

A state court decision is "contrary to clearly established Federal law" when: (a) the state court " 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' "; or (b) " 'the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent .' " *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court

decision involves an unreasonable application of clearly established federal law when it identifies the correct legal rule from Supreme Court case law, but unreasonably applies that rule to the facts. *Williams v. Taylor*, 529 U.S. at 407–08. Likewise, a state court unreasonably applies federal law when it either unreasonably extends, or refuses to extend, a legal principle from Supreme Court precedent where it should apply. *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008).

### III. Issues

The petition asserts several errors by trial counsel, several incidents of prosecutorial misconduct, and cumulative error, all of which allegedly violate Petitioner's right to effective assistance of counsel or to a fair trial. Dk. 1, 2. Specifically, Petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to investigate the minor victim's medical records, by failure to present testimony that the victim's mother had threatened to send Petitioner back to prison, and by cumulative error. Petitioner further claims that he was denied a fair trial by two instances of prosecutorial misconduct in commenting on witness credibility, and by cumulative error. Lastly, Petitioner claims that the cumulative effect of ineffective assistance of counsel and of prosecutorial misconduct violated his constitutional right to a fair trial. Respondents claim that all but the first of these claims are procedurally defaulted.

### A. Procedural Default

A writ of habeas corpus may not be granted unless the applicant has exhausted his available state court remedies. 28 U.S.C. § 2254(b)(1). In order to exhaust state remedies, a petitioner is required to give the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This full round includes a discretionary petition for review. *Id.* at 849. Where the time for filing a petition for review has passed, habeas claims not included in that petition are procedurally defaulted. *Id.* at 848-49.

In his petition for review to the Kansas Supreme Court, Petitioner raised three issues: 1) ineffective assistance of trial counsel in failing to investigate the child's medical history; 2) trial court error in denying Petitioner's motion to compel a psychiatric examination of the child; and 3) sentencing error based on petitioner's criminal history score. (Appellant's Petition for Review, pp. 1, 5-11.) The only issue presented in Petitioner's petition for review and thus exhausted, for purposes of this habeas action, is counsel's alleged ineffectiveness for failing to investigate the child's medical records. Petitioner has procedurally defaulted all other issues. *See O'Sullivan,* 526 U.S. at 848-49.

Federal habeas review of the procedurally defaulted claims is barred unless Petitioner demonstrates either: 1) cause for his procedural default, and resulting prejudice; or 2) that a fundamental miscarriage of justice will result if his claims are not considered. *See Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *Fairchild v. Workman,* 579 F.3d 1134, 1141 (10th Cir. 2009). Petitioner does not demonstrate cause for his failure to present these claims to the state court. *See Coleman*, 501 U.S. at 750 (finding that " 'cause' under the cause and prejudice test must be something external to the petitioner.") The "cause and prejudice" exception is thus not applicable.

Nor has Petitioner demonstrated that he qualifies for review under the fundamental miscarriage of justice exception. *See Herrera v. Collins,* 506 U.S. 390, 403–04 (1993). To be excused from procedural default on the basis of this exception, petitioner must supplement his constitutional claim with a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986); *Brecheen v. Reynolds,* 41 F.3d 1343, 1356 (10th Cir. 1994), *cert. denied,* 515 U.S. 1135 (1995). Petitioner fails to do so. *Cf, United States v. Hickok,* 907 F.2d 983, 985 n. 2 (10th Cir. 1990) (finding defendant's assertion of his subjective belief in his own innocence insufficient). Instead, Petitioner has not filed a traverse or otherwise contested the State's assertion that all issues but one are procedurally defaulted. Accordingly, all claims not included in the petition for review are procedurally barred from federal habeas review.

## B. Ineffective Assistance of Counsel

The sole claim properly before this Court is that Petitioner's trial counsel was unconstitutionally ineffective in failing to investigate the victim's medical history.

### 1. Facts

The facts, as stated by the KCOA, follow.

> Near the end of 2000 or the beginning of 2001, A.G. (Mother) started dating Frost. Several months later, Mother, her 8-year-old son B.G. (the child), and the child's twin sibling moved into Frost's home.
> After moving into the home, the child began soiling himself in his underwear. According to the child, Frost was sexually abusing him and he was "okay" with soiling himself because he wanted Frost to think he was "kind of gross" and to "stay away." Unaware of the alleged sexual abuse, Mother took the child to several doctors in an attempt to uncover the reason the child was defecating in his clothing.
> For reasons unrelated to the issues presented in this case, Mother and the children stopped living with Frost in March or April of 2002. Frost, however, continued to speak with the child and his sibling over the telephone for another 5 or 6 months. According to Mother, Frost's absence coincided with the gradual decrease and eventual cessation of the child's soiling behavior. The child's condition also improved after Dr. David Nichols, the child's primary care physician, prescribed the child medication in December 2002.
> On May 7, 2004, Mother took the child to Cindy Coggins, a licensed professional counselor, in order to have him evaluated for possible Attention Deficit Hyperactivity Disorder (ADHD). During this visit, Mother relayed to Coggins her suspicion that the child had been sexually abused. Mother stated the child was withdrawn and had experienced daily bowel problems on and off for the last 3 years, although they had stopped in the 3 weeks prior to the visit. Coggins asked the child during this visit if anyone had hurt him; the child turned to look at his mother but said nothing. Coggins ended the session, advising Mother that if anything had happened to the child, he would disclose it when he was ready.
> In the fall of 2004, Frost reportedly attempted to telephone Mother and reinitiate contact with her. When Mother discussed Frost's alleged phone call with her then fiance, the child reportedly overheard the conversation and his soiling behavior resumed. Around that time,

the child wrote Mother a letter stating that someone had touched him, specifically mentioning Frost's name.

Mother called Coggins to tell her about the letter and the reoccurrence of the bowel condition. On November 30, 2004, Coggins met with Mother and the child. Mother gave Coggins the letter and, after recording notes about it, Coggins discarded the letter and conducted her second counseling session with the child. During this session, the child reported that Frost had sexually abused him on two separate occasions in two different rooms, describing each incident in detail. As a mandatory reporter, Coggins reported the suspected abuse to authorities.

The State's investigation resulted in a referral to Sunflower House, a child advocacy center. Sarah Byall, a social worker at Sunflower House, conducted a videotaped interview of the child. During the interview, the child made disclosures consistent with his statements to Coggins.

The State charged Frost with aggravated indecent liberties with a child. At the preliminary hearing, the child testified about two separate instances of abuse occurring in two separate rooms within the house. Slightly different from his prior statement to Coggins, however, the child further testified that Frost forced him to take off his and Frost's clothing (not that Frost did it himself) and that no abuse occurred in the bathroom.

Mother also testified at the preliminary hearing, stating that during the relevant time period, she sought medical treatment from Dr. Nichols for the child's bowel condition. After hearing Mother testify that the child never had experienced bowel problems before, Frost advised his attorney that Mother told him the child *did* have soiling issues prior to moving in with Frost in 2001. Frost directed his counsel, Phillip Crawford, to obtain the child's medical records.

. . .

Although Frost requested Crawford to obtain medical records regarding the child's bowel condition, Crawford never did so. Crawford explained he requested the State to provide discoverable information supporting their theory that Frost's alleged abuse and the child's soiling problems were linked. When the State informed him that it would not be relying on medical records to support its case, Crawford filed a motion in limine requesting the district court to prohibit the State from presenting evidence that the child suffered from encopresis, a physiological or psychological condition characterized by accidental, involuntary soiling.

In ruling on the motion, the district court agreed that evidence of an encopresis diagnosis would be hearsay and inadmissible if the State failed to call doctors to testify or present medical records.

7

Nevertheless, the court ruled that the fact of Mother's visits to doctors and therapists for treatment of the child's bowel condition could be admitted as an exception to the hearsay rule to show the reasons supporting Mother's actions.

At trial, Coggins testified Mother identified the child's bowel condition as encopresis, which Coggins described as a condition characterized by accidental, involuntary bowel movements. Coggins explained to the jury that, although encopresis generally stems from a physical medical condition, it also can be psychological in nature. When specifically asked whether, if psychologically grounded, the condition is consistent with a child that has been sexually abused, Coggins responded that "[i]t can be."

In response, Frost presented the testimony of Dr. William Logan, a physician specializing in psychiatry. According to Dr. Logan, the accidental soiling which characterizes encopresis could be caused by several things, including food allergies, gastrointestinal problems, or anxiety. From what Dr. Logan could garner from his review of the child's history, there were several potential causes of the child's soiling problem, including developmental delays, relocations, parental relationships, and numerous school changes. Dr. Logan's testimony stressed that encopresis could result from any of these anxiety provoking phenomena, not just sexual abuse.

When cross-examined by the State at trial, Dr. Logan admitted he was a forensic psychiatrist, which he defined as "one who yields a psychiatric opinion about some issue of legal importance." Furthermore, when the prosecutor suggested that the "meat and bones" of being a forensic psychiatrist involved "presenting your opinions in court to a fact-finder," Dr. Logan disagreed and explained that his primary function was to undertake a solid clinical evaluation of the individual. Dr. Logan admitted, however, that in this case, he had been unable to conduct a clinical evaluation of the child and that his opinion was based on the limited records that had been made available, including the child's interviews with Coggins and at Sunflower House, as well as the preliminary hearing transcript.

Frost also testified at trial, denying that he had ever seen the child naked or with his pants pulled down or that the child saw him with his pants pulled down. Frost also denied that any fondling or other sexual contact occurred.

The jury ultimately convicted Frost of aggravated indecent liberties with a child. Frost requested new counsel and filed a motion alleging he was entitled to a new trial because he had received ineffective assistance from Crawford. Specifically, Frost faulted Crawford for failing to obtain the child's medical records. Frost contended these records establish that Dr. Nichols first treated the

child for soiling himself in September 1996, approximately 5 years before he met Frost. Frost further contended the records included a note dated August 19, 2002, that read "school needs note to have juice instead of milk. [The child] has bowel movement accidents if he drinks milk." Additionally, Frost claimed that Crawford failed to present evidence that Mother told witnesses before trial that she would ' "send [Frost] back to prison one way or another.' " After an evidentiary hearing, the district court concluded Crawford effectively represented Frost at trial and, accordingly, denied Frost's motion for new trial. It is from this decision that Frost appeals.

*Frost*, 2009 WL 2371007 at 1-3.

### 2. State Court Review

The KCOA held that counsel's decision not to try to obtain the child's medical records in order to investigate the alleged prior bowel condition, or its underlying cause, was unreasonable, rendering his performance deficient under the circumstances. *Frost*, p. 5. The majority nonetheless held that Petitioner was not prejudiced by that error. The dissent, however, found sufficient prejudice to warrant a new trial. This Court's discussion focuses on the issue of prejudice.

### a. Improper Standard

Petitioner contends that the KCOA applied a "but for" standard which is outcome determinative and is contrary to the proper reasonable probability standard. See *Strickland v. Washington,* 466 U.S. 668, 693 (1984).

In finding no prejudice, the KCOA majority stated the following standard:

> Before counsel's assistance is determined to be so defective as to require reversal of a conviction, however, we must further find that counsel's deficient performance prejudiced the defense and deprived

9

> Frost of a fair trial. To establish prejudice, a defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Wilkins v. State,* 286 Kan. 971, 986, 190 P.3d 957 (2008). As applied to Crawford's decision not to obtain the child's medical records, Frost must demonstrate a reasonable probability that he would have been acquitted by the jury if they had known (1) the child was seen by a doctor with regard to a soiling condition 5 years earlier, when he was 4 years old, and (2) there was a note dated August 19, 2002, in the child's medical records stating "school needs note to have juice instead of milk. [The child] has bowel movement accidents if he drinks milk." Given the overwhelming evidence of Frost's guilt presented at trial, we are not persuaded that the jury would have reached a different result had it been presented with the information to which Frost refers.

*Frost,* 2009 WL 2371007, 5.

Clearly established federal law states the same standard.

> The Court also required that defendants prove prejudice. [Citation omitted. 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [*Citing Strickland*, U.S. at 694.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Ibid.* That requires a 'substantial,' not just 'conceivable,' likelihood of a different result. [Citation omitted.]"

*Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011). No error thus appears in the legal standard articulated by the KCOA.

### b. Unreasonable Application

Petitioner additionally alleges that the KCOA unreasonably applied the prejudice standard. The KCOA based its finding of no prejudice on what it found to be "overwhelming evidence" of Frost's guilt. Petitioner believes the KCOA erroneously emphasized the "totality of the evidence" presented at trial, rather than the overall effect of counsel's errors.

10

That evidence against the Petitioner largely consisted of statements the child made at trial or had made earlier, testimony by the child's mother, and circumstantial evidence supporting an inference that the child's bowel accidents were caused by Frost's sexual abuse of the child.

> More specifically, both Mother and the child testified that the child had never experienced soiling problems before moving in with Frost, that after Frost moved out of the home the child's bowel condition gradually improved, and that the soiling behavior suddenly reappeared when the child overheard that Frost had attempted to reinitiate contact with Mother.

*Frost*, p. 6.

Petitioner contended that the evidence against him was far from overwhelming, noting inconsistencies in the child's statements, and expert testimony that the soiling incidents could be due to any number of causes.

> In arguing that the direct and circumstantial evidence against him was not strong, Frost highlights inconsistencies in the child's testimony regarding the abuse and Dr. Logan's testimony regarding causes of encopresis other than abuse. With regard to inconsistencies in the child's statements, Frost notes that the child (1) first maintained that Frost removed the child's pants, but later testified that Frost forced the child to do so; (2) first maintained that Frost removed his own pants, but later testified that Frost forced the child to do so; and (3) first maintained that some of the abuse during the second incident occurred in a bathroom, but later denied that this was the case. Moreover, Dr. Logan testified that
>
>> "[a]ny number of things [can cause encopresis,] varying from different types of gastrointestinal problems, sometimes developmental delays in the kid's training, irritable bowel syndrome that may be caused by food allergies or anxieties. Sometimes the child just doesn't have adequate warning. Sometimes emotional. There is quite a long differential diagnosis.

11

> "Q From what you know of [the child] are there things in his life that could have caused [encopresis] other than be[ing] sexually abused?
> "A Yes.
> "Q What would those be?
> "A Developmental delays, moves, parental relationships, having to change schools numerous times."

Given the child's social and family history, Dr. Logan told the jury that there was simply insufficient information to clinically conclude that the child's encopresis was related to alleged sexual abuse:

> "Q Supposing that [the child] does have encopresis, can you say with any degree of certainty that sexual abuse is the cause?
> "A No. It's a generalized symptom of anxiety, even if it's emotionally based, and it isn't specific for sexual abuse."

*Frost*, p. 7.

Petitioner argued that the unoffered medical records likely would have persuaded the jury to acquit him because they showed that the child had had bowel accidents before he ever met Frost, and that in August of 2002 the cause of such accidents was attributed to the child's ingestion of milk[1]. The KCOA disagreed, finding that the admitted testimony made the same point the medical records would have made:

> Looking first to the testimony that was presented to the jury, we note that when compared to what was *consistent* with the child's statements, the inconsistencies are nominal. The child's accounts established the elements of the crime for which Frost was convicted, and it was the jury's function to determine his credibility. Moreover, the abuse occurred approximately 4 years before trial, when the child was 9 years old. Under these circumstances, some variation may be expected.
> Notably, Dr. Logan's testimony regarding insufficient evidence to link the encopresis to the alleged sexual abuse successfully controverted the State's implication to the contrary. Even Coggins

---

[1] Whether the physician or the mother made that attribution is unclear.

testified that "sometimes it's unknown, you know, what actually brought [the encopresis] on. Because sometimes once you deal with the emotional issues it will completely go away, sometimes it won't. And there is not always a way to indicate what actually caused." Thus, the jury was made well aware of evidence explaining away the significance of encopresis, yet chose nevertheless to convict Frost. Accordingly, the medical records argued for by Frost pale in significance. Furthermore, Dr. Logan's testimony did nothing to rebut the child's consistent detailed testimony that the abuse occurred and that he was "okay" with soiling himself because he wanted Frost to think he was "kind of gross" and to "stay away."

...

Neither do we believe that annotations in the child's medical record indicating that he previously suffered from soiling issues 5 years before meeting Frost would have swayed the minds of the jurors. The fact that the child started soiling himself (even if not for the first time in his life) after he moved in with Frost is undisputed. Even if Crawford had introduced evidence proving that the child had bowel problems long before meeting Frost, this fact does not contradict the child's direct testimony that Frost sexually abused him and that he was "okay" with soiling himself because he wanted Frost to think he was "kind of gross" and to "stay away." In fact, because the record cites no medical cause for the bowel problems that occurred when the child was 4 years old, the jury would have been free to infer that the child soiled himself in response to anxiety or trauma back then and, because the bowel condition recurred, there must have been some anxiety or trauma occurring around the time the child moved in with Frost. Obviously, this inference would not have been helpful to Frost.

Moreover, we find that the child's young age, 4 years old, at the time of the pre-abuse soiling renders negligible any effect Nichols' medical records could have had in impeaching the child's testimony, at 13 years old, that no soiling problems existed prior to coming into contact with Frost. Additionally, Nichols' medical records only prove that in September 1996 Nichols examined the child and assessed that the child was suffering from encopresis; the records mention no other bowel complaints, treatment, or issues during the 5 years between 1996 and 2001. We simply do not believe that evidence establishing one solitary incident of pre-abuse soiling could have had any likelihood of changing the result at trial.

*Frost*, p. 7-8. The KCOA concluded that counsel's deficient performance did not prejudice his defense or deprive Petitioner of a fair trial.

13

The dissent viewed the strength of the evidence presented at trial and the potential weight of the unoffered evidence differently.

> … I depart with the majority because I'm not as certain that the failure to get these records made no difference at Frost's trial. Two witnesses were key at trial: the child victim and his mother. The defense tried to show that the mother was lying, perhaps out of animus toward Frost, and that her influence over her son had led to false abuse charges against Frost. But one objective fact seemed to corroborate both the mother's testimony and that of the child: his problem of soiling his pants began only after he had moved in with Frost and, thus, presumably in response to Frost's criminal abuse. The medical records would have provided objective evidence that the child had had this same problem before any acquaintance with Frost.
>
> After finding the attorney's investigation inadequate, the majority still finds no need for a new trial because it concludes that the evidence of guilt in the case was overwhelming. Certainly, there was substantial evidence against Frost via the testimony of the child and his mother. But the cross-examination of those witnesses would have been much stronger had these medical records been available.
>
> Both the child and his mother testified that he hadn't soiled his pants before he lived with Frost, and the medical records show that to be untrue. Given the mother's testimony that child had never done this before and that the instances when the child soiled his pants coincided with the specific incidents of abuse by Frost (or the possibility of Frost re-entering the household), the jury seemed to have strong and objective evidence corroborating the child's allegations. The State naturally emphasized this evidence in closing argument:
>> "You should find it very, very interesting that the only time that these accidents started happening, the only time they happened, was when the defendant had direct contact with [the child] and when the defendant reinitiated contact with his mother that [the child] was aware of. And that happened to coincide with the time that [the child] said sexual abuse occurred."
>
> Even if the medical records had all come into evidence at trial, the jury might still have considered the evidence sufficient to find the defendant guilty beyond a reasonable doubt. But the jury might well have considered the objective foundation of the State's case sufficiently shaken that reasonable doubt of guilt had been shown.
>
> To show prejudice resulting from an attorney's inadequate representation, a defendant must show a reasonable probability that the trial result would have been different had proper representation been provided. "A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Harris v. State,* 288 Kan. 414, Syl. ¶ 3, 204 P.3d 557 (2009). In my view, Frost has made that showing. I would order a new trial so that a jury could determine the strength of the evidence with knowledge that a key assertion of the child and his mother wasn't true.

*Frost*, at 13.

### 3. Habeas Review

In reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

#### a. Clearly Established Federal Law

Under *Strickland v. Washington,* 466 U.S. 668, 687 (1984), an error of constitutional magnitude occurs in the Sixth Amendment context only if the defendant demonstrates (1) deficient performance and (2) prejudice. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* at 691, But "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* One who challenges his counsel's effectiveness because of counsel's failure to

15

investigate must establish that the decision not to investigate was unreasonable from counsel's perspective at the time the decision was made. *See Anderson v. Attorney Gen. of Kan.*, 425 F.3d 853, 859 (10th Cir. 2005). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, ––– U.S. ––––, ––––, 131 S.Ct. 770, 788 (2011).

In order to obtain relief under *Strickland*, it is not sufficient that a petitioner can point to his attorney's deficient performance. In addition, he must be able to demonstrate that the complained of deficiency resulted in prejudice, or a "reasonable probability" that in the absence of error the result of the proceedings would have been different, *Strickland*, 466 U.S. at 694, and was fundamentally unfair or unreliable. *Lockhart v. Fretwell*, 506 U.S. 364, 368-70 (1993).

### b. Analysis

Having reviewed the record in detail, the Court finds that the KCOA reasonably found no prejudice to Petitioner from counsel's failure to investigate the child's medical records. Accordingly, the Court need not decide whether counsel's performance was deficient. *See Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.")

Further, the Court does not decide whether it would have agreed with the KCOA dissent or with the majority on the question of prejudice, had that issue been presented to this Court *de novo*. The unobtained medical records would obviously have been valuable to the defense, both for their impeachment value and as substantive evidence, and create a close call on the issue of prejudice, as the trial attorney acknowledged during the evidentiary hearing on the motion for new trial and as the KCOA dissent found. Constrained, however, by the narrow scope of review in habeas cases, the Court is compelled to deny the petition. For the reasons stated by the KCOA majority, the Court finds that Petitioner has not shown a reasonable probability that the result of his trial would have been different but for counsel's failure to investigate the medical records.

## IV. Evidentiary Hearing

The court finds no need for an evidentiary hearing. ("[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record.)" *Anderson v. Attorney Gen. of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005) *Schriro,* 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

## V. Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Proceedings states that the court must issue or deny a certificate of appealability when it enters a

final order adverse to the applicant. "A certificate of appealability may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has rejected the constitutional claims on the merits, a petitioner makes that showing by demonstrating that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). *See United States v. Bedford*, 628 F.3d 1232 (10th Cir. 2010). The Court finds that Petitioner has met this standard as to the sole issue discussed on the merits, so grants a certificate of appealability on the issue whether Petitioner's trial counsel was unconstitutionally ineffective in failing to investigate the child's medical records.

IT IS THEREFORE ORDERED that the petition for habeas corpus relief under 28 U.S.C. § 2254 (Dk.1) is denied.

Dated this 5th day of March, 2013, at Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge